**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3707-15T3
                  A-0060-16T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MALCOLM A. BRADLEY, a/k/a HOOP
BRADLEY, MALCOLM H. BRADLEY,
MALCOM BRADLEY, and MALCOM
A. BRADLEY,

     Defendant-Appellant.

_____

        Argued September 12, 2018 – Decided September 28, 2018

        Before Judges Sabatino and Sumners.

        On appeal from Superior Court of New Jersey, Law Division, Union County, Indictment No. 11-10-1031; and Middlesex County, Indictment No. 11-07-1083.

        James K. Smith, Jr., Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; James K. Smith, Jr., of counsel and on the briefs).

Jane C. Schuster, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Sarah C. Hunt, Deputy Attorney General, of counsel and on the brief in A-3707-15; Jane C. Schuster, of counsel and on the brief in A-0060-16).

PER CURIAM

These back-to-back appeals[1] concern a homicide prosecution in Union County (A-3707-15) and a separate narcotics/firearms possession prosecution in Middlesex County (A-0060-16). The two cases involve the same warrantless search by police of a house in Edison in Middlesex County. Through the tracking of his girlfriend's cell phone, the police found defendant Malcolm A. Bradley at the house several days after a fatal shooting in Plainfield in Union County of Curtis Stroud.

According to the State's proofs, defendant and Stroud had an argument on the evening of March 15, 2011. The shooting occurred later that night when a rented Toyota being driven by defendant pulled up at a stoplight next to an Acura in which Stroud was a back-seat passenger. Words were exchanged between the young men, and a gunshot was fired that hit Stroud in the chest and killed him.

The State contends the fatal shot was fired by defendant, whereas defendant claims Stroud was accidently shot by Stroud's brother Kenneth

---

[1] We consolidate the appeals for purposes of this combined opinion.

Roberts, a front-seat passenger in the Acura. After the gunfire, defendant sped away in the Toyota with his cousin Jamie Scott, who was in a relationship with Roberts.

The Acura driver, Dashaun Randolph, drove Stroud to the hospital with Roberts. Randolph and Roberts then got back into the Acura and drove away. They were stopped by police and taken to the police station. The police found five nine-millimeter bullet cartridges in Roberts' pocket, containing bullets which a ballistic expert found to be "very, very similar, if not identical to" the lethal bullet recovered from the rear seat of the Acura. The recovered projectile was determined to be a ".38 caliber class" bullet, meaning that it could have been fired from several different types of handguns. However, since the gun that fired the fatal shot was never recovered, the projectile could not be matched to the actual handgun.

Roberts denied shooting Stroud, and eventually described the shot as having been fired from the Toyota. Randolph testified he heard a "firecracker" sound and smelled and saw smoke coming from outside of the Acura after the Toyota had pulled alongside. Scott stated she did not see who shot Stroud, and specifically denied seeing defendant fire a gun.

A-3707-15T3

Ten days after the shooting, homicide investigators obtained two Communications Data Warrants ("CDW") and traced the cell phone of defendant's girlfriend, Nicole Timmons, to the Edison residence. The police had a warrant to arrest defendant, but not a warrant to search the residence. Later that evening, more than ten law enforcement officers converged at the Edison house, after several of them had met at a nearby diner to plan their entry. The Toyota was parked about a block away.

Several of the officers approached the house. The lead detective rapped on the front door. The officers entered the house after an occupant named Mikiel Adl opened the door and stepped to the side. Once inside, the police saw defendant on a couch. A handgun was found under defendant wedged between the sofa cushions, although it was not the gun used to shoot Stroud. The police also found drugs in plain view on a table near defendant.

The police arrested and handcuffed defendant and took him outside to a squad car. Defendant asked the police for his jacket, which was inside the house. The police went inside and retrieved the jacket. At trial, Roberts testified that defendant was wearing this jacket the night of the shooting.

A-3707-15T3

Before being taken down to headquarters, defendant initiated a conversation with one of the officers, Sergeant George R. Jiminez. He asked if Jiminez had spoken "to the [unidentified] girl to get the whole story."

Defendant was charged in Middlesex County with illegal possession of the confiscated firearm and various drug offenses. He moved to suppress the gun and drugs seized from the house without a warrant.

The Middlesex County judge conducted a suppression hearing. The judge heard what he found to be credible testimony by the lead detective describing the activities of the police in the investigation and the search of the residence. Following that hearing, the judge ruled the seized contraband was admissible. Specifically, the judge found that Adl had given the police valid consent to enter the house. The judge also found that Adl had apparent authority to provide such consent.

After losing the suppression motion in Middlesex County, defendant entered into a negotiated guilty plea to second-degree unlawful possession of the seized gun, N.J.S.A. 2C:39-5(b) and fourth-degree possession of the seized marijuana with intent to distribute it, N.J.S.A. 2C:35-5. The Middlesex County judge imposed a six-year custodial sentence on the gun charge, subject to a three-year parole disqualifier. The judge also imposed a one-year consecutive

term on the marijuana count, with a six-month period of parole ineligibility. Pursuant to Rule 3:5-7(d), defendant preserved his right to appeal the Middlesex County suppression ruling.

Before trial in the Union County case, defendant moved to suppress the jacket and his post-arrest statement to Sergeant Jiminez. With the consent of the parties, the Union County judge considered a transcript of the Middlesex County suppression hearing. The Union County judge also considered additional testimony, which included the lead detective's revelation about the officers' planning session that had occurred at the diner before they entered the Edison residence.

The Union County judge upheld the warrantless entry of the Edison house on different grounds than the Middlesex County judge. Rather than resting on a theory of consent, the Union County judge concluded the search was justified under the exigent circumstances doctrine. The Union County judge found the police had reasonably believed defendant to be armed and dangerous, and on the move. The judge concluded it was impracticable to obtain a search warrant under the circumstances.

The first trial in Union County in the fall of 2014 resulted in a hung jury. The second trial, which lasted ten days in November 2015, resulted in defendant

being convicted of murder, N.J.S.A. 2C:11-3(a)(1) and (2), possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a), and criminal restraint, N.J.S.A. 2C:13-2.

At sentencing, the Union County judge imposed a forty-two-year term on the murder count, subject to a parole disqualifier under the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2, plus a concurrent four-year term on the weapons count. The criminal restraint count merged into the murder count.

In both of these appeals, defendant principally challenges the Middlesex County and Union County judges' respective denials of his pretrial suppression motions. Among other things, he maintains the United States Supreme Court's opinion in Steagald v. United States, 451 U.S. 204 (1981), requires police to obtain a search warrant in order to enter a third party's residence and execute a warrant to arrest an occupant located inside the premises. Defendant also contests the applicability of the consent and exigency exceptions to the warrant requirement.

Defendant further argues in the Union County appeal that a police witness who testified at trial for the State gave improper opinion testimony about the trajectory of the bullet found in the Acura seat cushions. Lastly, defendant complains that the Union County judge should have issued, sua sponte, a jury

charge on the concept of third-party guilt relating to defendant's theory that Stroud had been shot by Stroud's brother Roberts.

More specifically, defendant raises the following points in his brief in the Union County case (A-3707-15):

> POINT I
>
> BECAUSE THE SEARCH WAS COMMITTED IN CLEAR VIOLATION OF STEAGALD v. UNITED STATES, 451 U.S. 204 (1981), AND BECAUSE NEITHER THE CONSENT, APPARENT AUTHORITY, NOR EXIGENT CIRCUMSTANCES EXCEPTIONS APPLY, THE MOTION TO SUPPRESS THE JACKET AND THE DEFENDANT'S RESULTING ORAL STATEMENT SHOULD HAVE BEEN GRANTED.
>
> A. The Steagald Rule
>
> B. Mikiel Adl's Act Of "Stepping Aside" For The Police Did Not Equate To Consent To Enter.
>
> C. Adl's Act Of Answering The Door Did Not, By Itself, Provide The Police With A Reasonable Basis To Believe That He Had Apparent Authority To Consent To A Search Of The Premises.
>
> D. There Were No Exigent Circumstances To Justify The Entry Into [H.G.'s] House Some Ten Days After The Shooting.
>
> E. The Jacket Seized After Defendant's Arrest And Defendant's Subsequent Oral Statement Must Both Be Suppressed As Fruit Of The Poisonous Tree.

8

1. The Seizure of the Jacket

2. The Oral Statement

POINT II

THE DEFENDANT WAS DENIED A FAIR TRIAL WHEN DET. ADRIAN GARDNER, WHO WAS NOT QUALIFIED AS AN EXPERT IN CRIME SCENE PROCESSING, BALLISTICS, OR BULLET TRAJECTORY, WAS ALLOWED TO GIVE HER OPINION THAT THE FATAL SHOT HAD COME FROM THE AREA OF THE REAR PASSENGER SIDE WINDOW OF THE BLACK ACURA.

A. The Trial Testimony

B. Legal Argument

POINT III

BECAUSE THE DEFENSE OF THIRD[-]PARTY GUILT WAS THE ONLY DEFENSE PRESENTED, AND BECAUSE THE FACTS SUPPORTING THAT DEFENSE WERE CLEARLY INDICATED IN THE RECORD, THE TRIAL COURT COMMITTED PLAIN ERROR IN FAILING TO CHARGE THE JURY ON THAT DEFENSE. (Not raised below)

In his brief in the Middlesex County case (A-0060-16), defendant repeats verbatim the arguments set forth in Points I (A) through (D) of his brief in the Union County case.

Having considered these arguments in light of the applicable law and the record, we affirm defendant's conviction in the Union County case. In doing so,

9

we note our disagreement with the Union County judge's analysis of the suppression issues and his reliance on the exigent circumstances exception. Nevertheless, we conclude the erroneous suppression ruling was harmless, in light of the independent evidence of defendant's guilt of the homicide and of the other Union County charges.

As to the Middlesex County case, we disagree with that judge's denial of the suppression motion and, in particular, his conclusion that Adl provided valid consent to allow the police to enter the residence. Because the gun and drugs seized as a result of the warrantless police entry were an integral aspect of defendant's negotiated guilty plea to the Middlesex County possessory offenses, we vacate that judgment of conviction. We remand to allow defendant to withdraw his plea in that case.

## I.

The primary issue in both appeals is the constitutionality of the police officers' entry into the Edison house without obtaining a search warrant to authorize their entry. Given the importance of that issue, we recite in greater depth the factual evidence developed concerning the search and seizure.

10

A.

<u>The Middlesex County Suppression Hearing</u>

Detective Sergeant Michael Triarsi of the Union County Prosecutor's Office was the only witness to testify at the suppression hearing in Middlesex County. Triarsi was the lead detective on the Stroud homicide case.

Following Stroud's death, Triarsi's office suspected defendant of shooting Stroud and obtained a warrant for defendant's arrest. Triarsi learned defendant may have been with his girlfriend, Timmons, after the shooting.

Triarsi's office obtained a CDW to track Timmons' cell phone in an effort to locate defendant. After the phone was traced to the general area of Fox Road in Edison, Triarsi obtained another CDW so that the State Police could assist him in pinpointing the phone's precise location.

With the aid of the CDW information, Timmons' phone was traced to a certain house on Fox Road in Edison. On March 25, Triarsi and his fellow officers "observed the vehicle which was a silver Toyota, which was known to be involved in the homicide, parked approximately a block from the house." Triarsi then "contacted [the] Edison Police Department, [and] we had them come to the house. We then went to the house and knocked on the front door."

11

Triarsi initially testified that he rapped on the door around 11:30 p.m. Although Triarsi was wearing plain clothes when he went to the door, he had a badge around his neck or something identifying himself as a police officer. Triarsi recalled there were other officers present at the house from the Union County Prosecutor's Office and patrol officers from the Edison Police Department.

Triarsi estimated that about ten law enforcement officers had converged on the house. He recalled about three to five officers were standing directly around him when he knocked on the door.

According to Triarsi, he "banged on the door, and eventually somebody came to the door, which [he] subsequently found out was Mikiel Adl." Adl opened the door. Triarsi asked Adl, "[W]here is he, where is he[?]" Adl then stepped to the side, at which point the officers went into the house.

When asked to clarify at the Middlesex County hearing whether he had knocked or banged on the door, Triarsi testified that, "Banged is probably a better description." Triarsi could not recall if he identified himself as "Detective" Triarsi at that time, but that he believed he identified himself as a police officer.

Triarsi described how he entered the home, as follows:

I banged on the door, Adl opened the door. The door opens inward, I guess it's inward to the right it would be. He was standing in front of the doorway. The door was here, he was standing – the door was to his right. So, [Adl] was standing in the doorway itself in place of the door, holding onto the – the door handle. So, as I – you know, I think I said something to the effect of where is he, where is he, or something to that effect. At that point Adl then steps to the side.

Triarsi described Adl as "[k]ind of leaning his body and allowing us access to the home." He recalled that the other law enforcement officers standing near him were "all behind" him and that they went inside with him.

The following exchange occurred concerning Triarsi's interaction with Adl:

Q    Did you request Mr. Adl's identification when you arrived, or did you simply go in as soon as he stepped to the side?

A    Once Mr. Adl stepped to the side we went in the house.

Q    Okay. Did you ask him who he was?

A    No.

Q    Did you present any documentation to him?

A    No.

Q    Did you ask Mr. Adl if the owner of the house was present?

13

A        No.  You're talking initially when we came into the door?

Q        Correct.

A        No.

Describing the entry into the house, Triarsi testified, "As you come in the front door there's a small foyer, and then maybe three feet, four feet, and then there's the front room, which I – which was what I would call a den, that had a coffee table and a couch and something there.  And that's where [defendant] was."  "We walked in the room, I believe [a] Sergeant . . . at the time was behind me, he said, there he is.  We then went over to the couch were [defendant] was.  At that point in time we took [defendant] into custody."

Triarsi described defendant as laying on his back on the couch when the officers entered.  Once defendant was removed from the couch, the officers found "a handgun, a 38 [caliber gun]" underneath him.  The handgun "was kind of wedged between [defendant] and the cushions."  Triarsi did not need to move the cushions to find the gun.  In addition, Triarsi observed "drugs on the – on the glass top table, which [wa]s situated in front of that chair – in front of that couch."

Triarsi acknowledged he had "no idea" who Adl was in relation to the home when he entered.  According to Triarsi, no one indicated to him that he

could not enter the premises. He testified that no one asked for any information when the police entered, and that Adl had moved to the side. Triarsi had no idea who the owner of the home was until after he had entered it and spoke to the occupants.

Triarsi did not know if defendant lived at the Edison residence. He had several possible addresses for defendant, and this was not one of them. Police officers had checked "two or three" known locations they had for defendant, but he had not been present at any of them. Triarsi stated he had no reason to believe the Fox Road house was owned by defendant or Timmons, or that they were living there.

<u>The Middlesex County Judge's Findings of Consent and Adl's Apparent Authority</u>

The Middlesex County judge found Detective Triarsi's testimony credible. Upon considering that testimony, the judge concluded that Adl's act of stepping aside, as described by Triarsi, amounted to an "invitation" for the police to enter the dwelling. As that judge perceived it:

> It is clear that there may not have been words used, but actions often speak louder than words. <u>And the opening of the door, stepping aside in an answer to the question of 'where is he' is clearly, in the [c]ourt's mind, in finding an invitation to step into the dwelling</u>. And upon stepping in the dwelling [the police officers]

A-3707-15T3

observed the person whom they were seeking, Mr. Bradley, laying on the couch.

[(Emphasis added).]

Based on these findings, the Middlesex County judge denied the suppression motion on consent grounds, concluding:

This [c]ourt relies on State [v.] Suazo[2] . . . [an opinion which] recognize[d] that authority to consent arises from the mutual use of property, but persons generally having joint access or control for the most purposes. And in this case clearly the person who came to the door was exercising what could only be seen as [a] legitimate right to open that door and invite people in.

[(Emphasis added).]

Alternatively, the Middlesex County judge found that, even if Adl did not have actual authority to consent to the police entry, he at least had the apparent authority to do so. The judge noted in this regard, "[c]oming to the door, opening the door, clearly was an invitation by somebody authorized, having either direct legitimate authority or apparent authority to enter into the premise[s]."

The Middlesex County judge recognized the court's responsibility to consider whether the officers' belief that Adl, a third party, had authority to

---

[2] State v. Suazo, 133 N.J. 315 (1993).

16

consent to the police entry was "objectively reasonable in view of all the facts and circumstances at the time of the search." Applying that test of objective reasonableness, the judge concluded that Adl had both direct and apparent authority to consent to the entry and search. Therefore, the judge denied the motion to suppress the gun and drugs.

Testimony at the Union County Suppression Hearing

At the later suppression hearing in the homicide case, the Union County judge obtained the parties' consent to allow him to consider the transcript of the Middlesex County suppression motion, which was moved into evidence.

Triarsi supplemented his testimony at the Union County hearing. His testimony substantially echoed his earlier testimony from the Middlesex county hearing, with certain variations and additions.

At the Union County hearing, Triarsi elaborated more fully upon how the police were monitoring the area around Fox Road, after they tracked Timmons' phone to that general area. Triarsi explained:

> At that point in time we had – we had stayed in the area where [Timmons' cell] phone was continually pinging on and we would drive by different locations and look and – and we had one person watching the vehicle. In the event we saw somebody coming out of a house or that looked like [defendant], we knew what he looked like, so it was just a matter if we saw a car coming out of the general vicinity we would try to catch up to the

car, take a look in the car, see if it was [defendant] or Ms. Timmons or anybody you know that we knew running license plates, those type of things.

Triarsi described what he and the other law enforcement officers did after they spotted the Toyota involved in the shooting incident and found the exact location of Timmons' cell phone. In particular, he recounted[3] that he and several other officers met at a local diner to plan their entry into the residence:

> [The Union County officers] had been in contact with [the] Edison Police Department because it was happening in Edison. <u>We had a meet[ing] at the diner which is down the street from – from this house. We had some other people watching the house in the event somebody were to leave</u>. We explained to the Edison Police Department why we were there, that we had a search warrant, not a search warrant but we had an arrest warrant for [defendant] and that <u>we were going to go knock on the door of [the house on] Fox Road that he was wanted for a homicide</u> and you know everybody – make everybody apprised of what was going on.
>
> [(Emphasis added).]

The diner was approximately two blocks away from the Fox Road house, which the officers kept under surveillance. The meeting at the diner was to discuss the officers' next steps and course of action. Triarsi testified that not all

---

[3] Notably, the diner meeting was not the subject of testimony at the Middlesex County suppression hearing.

of the officers left the house, but that he did, despite the fact that he was in charge of the investigation.

In his Union County testimony, Triarsi increased his estimate of the number of police officers who were at the residence. "At the time we knocked on the door I believe there w[ere] probably five or six people, some five to seven people from my off—our office meaning the homicide and maybe seven or eight, six or seven from [the] Edison Police Department."

Triarsi elaborated how he and the other officers were able to get into the house. According to Triarsi, he

> knocked on the door, waited a couple of seconds, you know, knocked. Inevitably after a short period of time somebody came to the door. A white male came to the door. He opened the door. He opened it. Stood in the doorway where it was opened and I said ["W]here is he, where is he [?"] or something to that effect. At that point in time he stepped I guess to – I guess his left foot backwards and allowed us into the house.

After defendant was arrested inside the house and placed in handcuffs, he was taken out of the house to Triarsi's vehicle. Triarsi testified that he did not immediately speak with defendant, but rather issued him warnings using "a Miranda[4] [w]arnings card from [his] wallet." Triarsi testified that he explained

---

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

to defendant "why he was under arrest . . . that [Triarsi] would like to talk to him about the homicide but . . . didn't wish to do it at that particular point in time." Triarsi further stated that, "At some point in the conversation between [defendant] and [him] [defendant] explained to [him] that the gun that was found underneath him and the drugs on the table were his. But everything – anything else in that house was not his."

According to Triarsi, defendant asked for his jacket because he was cold. In response, Triarsi asked defendant what the jacket looked like, and defendant apparently gave Triarsi a description of it and said it was inside the house in the room where he had been arrested. Triarsi recalled that defendant described the jacket as "either black or green and it had fur on the collar and . . . on the cuffs also[.]"

Triarsi entered the home to retrieve the jacket, which he found "on the floor in the room where [defendant] was arrested." Triarsi checked the jacket for weapons, brought it back to the car, and gave it to defendant by placing it over his shoulders.

Although Triarsi stated at one point during the Middlesex County suppression hearing that he had "banged" on the door, at the Union County

20

suppression hearing he modulated that description, stating that he had "knocked." He asserted, "It was not an aggressive bang by any means."

Triarsi reiterated at the Union County hearing that he had no basis for believing that defendant or Timmons resided at the Fox Road residence. The officers did not ask whose house they were in or who lived there, until after they had entered and placed the occupants in handcuffs. After learning that another woman, H.G., lived in the house and that her father owned it, the police asked H.G. if she would consent to a search of the home. According to Triarsi, H.G. refused to consent to such a search. After defendant and the other occupants of the home were arrested, Triarsi applied for a search warrant.[5]

Sergeant Jiminez, who had not testified at the Middlesex County hearing, testified for the State at the Union County suppression hearing. Jiminez principally described his post-arrest interaction with defendant in his patrol car. As Jiminez recounted on direct examination:

> Q     When you transported [] defendant into your vehicle did he say anything to you?
>
> A     Yes, he did.
>
> Q     And what did he say to you?

---

[5] The fruits of any subsequent search of the house are not at issue on appeal.

A-3707-15T3

A    We had a very brief conversation. He asked me questions about his charges. I told him to hang on, we were on our way to our office where I was going to put him on video tape and Mirandize him again on video and I could answer any questions he had. He continued to engage me in conversation, I told him a couple of times just hang on, we'll get into the office pretty soon, we'll go up to my office and I'll talk to you right away.

On the way in he mentioned that he was anemic and we spoke about that for a quick second, <u>he then made reference to – he stated actually something along the lines did you speak to the girl to get the whole story</u>. Again, I told him sit tight we'll be in our office in a couple of minutes and at that point I took him – once we arrived to our office I brought him upstairs to the homicide unit.

[(Emphasis added).]

According to Sergeant Jiminez, he did not start any of this conversation with defendant. Jiminez denied asking defendant any questions. In addition, Jiminez did not answer defendant's questions, but rather told him "to sit tight, [and] wait until we get to the office."

After considering the testimony, the Union County judge denied defendant's motion to suppress his jacket and defendant's post-arrest statement to Jiminez about talking to "the girl." Unlike the Middlesex County judge, the Union County judge upheld the police entry and search on exigency grounds

rather than on a theory of consent. In his written opinion, the Union County

judge reasoned as follows:

> The defendant was charged with a brutal murder, an execution with a firearm after an argument at a KFC. The defendant was not at any of the usual[ ] places he lived or stayed. He was on the move. The defendant was known to use his girlfriend's silver Toyota on a regular basis. It was the car that allegedly was used in the murder and was parked near [the address on] Fox Road. The defendant was known to be frequently with his girlfriend Nicole Timmons. Prior to the arrest, Timmons' cell phone was moving. The defendant was not in any of the locations where he lived or stayed, he appeared to be on the move, the car he used was near the [house on] Fox Road, there was a direct hit that the phone was located [there], and the police had every reason to believe he would not be staying there on a permanent basis and was armed and dangerous.
>
> Under these circumstances I find that the police had reason to believe the defendant was at [the house on] Fox Road, that he was dangerous, and that exigent circumstances justified their entry.

In support of this analysis, the Union County judge cited to <u>State v. Craft</u>,

425 N.J. Super. 546, 554-55 (App. Div. 2012). The judge quoted a portion of

that opinion, which states:

> Whether exigent circumstances justify dispensing with the need for a search warrant must be determined on a case-by-case basis with the focus on police safety and preservation of evidence. In each case it is the circumstances facing the officers that tell the tale. While there is no magic formula, a court must consider

the totality of the circumstances to determine whether it was impracticable to secure a warrant prior to the search.

[Ibid. (internal quotation marks and citations omitted).]

The Union County judge analogized the present case to the situation in Craft: "As in Craft, . . . defendant [in this case] was potentially armed and dangerous, and I therefore find it was impractical to get a warrant and the safety of the officers dictated that they proceed in the manner in which they did."

B.

Under the Fourth Amendment of the United States Constitution and under Article 1, paragraph 7 of the New Jersey Constitution, "[a] warrantless search is presumed invalid unless it falls within one of the recognized exceptions to the warrant requirement." State v. Cooke, 163 N.J. 657, 664 (2000), overruled on other grounds by, State v. Witt, 223 N.J. 409 (2015). A defendant has a constitutional right to be free from indiscriminate searches and seizures by police without a warrant, unless one or more of the recognized exceptions to the warrant requirement apply. Witt, 223 N.J. at 422 (citation omitted).

In connection with these principles, defendant argues the Supreme Court's opinion in Steagald v. United States, 451 U.S. 204, renders unconstitutional the police entry into the Edison residence, without a search warrant, for the purpose

of executing an arrest warrant on defendant, an occupant within the premises. On the facts presented in Steagald, the Court held that the search violated the Fourth Amendment because warrantless searches of homes are generally impermissible, absent consent or exigent circumstances. Id. at 216.

However, Steagald does not address the precise context presented in this case. As this court recognized in State v. Miller, 342 N.J. Super. 474, 477, 489 (App. Div. 2001), in interpreting Steagald, the issue of whether evidence found during a search "conducted upon execution of a . . . warrant for [a] defendant's arrest, but without a search warrant," and "in a third-party's home" should be suppressed is "a factual situation one step removed from Steagald [.]"

To be sure, the first line of the Steagald opinion broadly reads, "The issue in this case is whether, under the Fourth Amendment, a law enforcement officer may legally search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant." 451 U.S. at 205. Nevertheless, the opinion later reflects that the discrete issue the Court actually decided in Steagald was more limited in scope.

As the Court clarified in Steagald, "the narrow issue before [the Court] is whether an arrest warrant – as opposed to a search warrant – is adequate to protect the Fourth Amendment interests of persons not named in the warrant,

when their homes are searched without their consent and in the absence of exigent circumstances." Id. at 212 (emphasis added). The Court expressly noted that it was not addressing a situation in which a defendant is the subject of the arrest warrant, but not a resident or owner of the searched premises. Id. at 219. As the Court explained, "The issue here, however is not whether the subject of an arrest warrant can object to the absence of a search warrant when he is apprehended in another person's home, but rather whether the residents of that home can complain of the search." Ibid. (emphasis added). Hence, Steagald is not on point for the present case.

That said, we agree with defendant that he has standing under New Jersey case law to challenge the warrantless police entry into the Edison house, despite the fact that he did not own the house or reside there and was not perceived by the police to be an owner or resident. In Miller, we addressed an appeal that arose from "the trial court's grant of [the] defendant's motion to suppress evidence that was found . . . in a third-party's home in a search conducted upon execution of a parole warrant for [the] defendant's arrest, but without a search warrant." 342 N.J. Super. at 477. Miller is thus similar factually to the present appeal.

We noted in <u>Miller</u> that "our principles of standing to bring a motion to suppress evidence obtained in an unlawful search and seizure are broader than those which govern the application of the standards developed under the Fourth Amendment to the Constitution of the United States." <u>Id.</u> at 478 (citation omitted). "Under State law, the motion may be brought by a defendant against whom evidence is proffered 'if he has a proprietary, possessory or participatory interest in either the place searched or the property seized.'" <u>Ibid.</u> (citation omitted).

The New Jersey Supreme Court recently reaffirmed these broader standing principles under our State law in <u>State v. Randolph</u>, 228 N.J. 566, 585-89 (2017), holding that when a defendant is charged with a possessory offense, standing is automatic, unless the State can show the premises searched were abandoned or the defendant was a trespasser. Moreover, the Court in <u>Randolph</u> noted it has "roundly rejected hinging a defendant's right to challenge a search based on 'a reasonable expectation of privacy' analysis." <u>Id.</u> at 583 (citations omitted). Hence, even if a non-owner and non-resident occupant of a dwelling does not have the same privacy interest in the premises as an owner or resident, he or she nonetheless can object in our State courts to the constitutionality of a warrantless police entry into the house.

Here, defendant was charged with, among other things, possession of the gun found in the house underneath him on the sofa and the drugs found on the table next to him. He therefore had a presumed possessory interest enabling him to object to the seizure of those items.

In addition, the jacket the police removed from the premises was used by the State in the Union County case as evidence of defendant's participation in the homicide. Accordingly, he had a participatory interest to support his motion to suppress the jacket evidence. See State v. Mollica, 114 N.J. 329, 339-40 (1989) (explaining the concept of a defendant's "participatory interest" in evidence of a crime, which can confer standing upon "a person who, challenging the seizure and prosecutorial use of incriminating evidence, had some culpable role, whether as a principal, conspirator, or accomplice, in a criminal activity that itself generated the evidence").

Thus, regardless of the inapplicability of Steagald, defendant has standing under New Jersey law to move to suppress these physical items. Neither of the exceptions to standing apply. There is no evidence that the Edison house was abandoned, or that defendant was trespassing on the premises. Cf. Randolph, 228 N.J. at 583 (noting the exceptions for abandoned premises and trespassers).

A-3707-15T3

C.

We now turn to whether the State demonstrated that the consent or exigent circumstances exceptions to the constitutional warrant requirement pertain here. In doing so, we remain mindful of our scope of appellate review. We must defer to the trial court's findings of fact "so long as those findings are supported by sufficient evidence in the record." State v. Hubbard, 222 N.J. 249, 262 (2015) (internal citations omitted); see also State v. Gonzales, 227 N.J. 77, 101 (2016) (recognizing factual findings will be upheld if there is sufficient credible evidence in the record to support the findings).

However, we owe no deference to the trial court's conclusions of law. See State v. Hinton, 216 N.J. 211, 228 (2013) (internal citations omitted). Nor are we "obliged to defer to clearly mistaken findings . . . that are not supported by sufficient credible evidence in the record." State v. Gibson, 218 N.J. 277, 294 (2014).

To a considerable extent, the respective rulings of both the Middlesex County and Union County judges on the suppression motions embody a mixture of factual and legal determinations, and the significance, under search-and-seizure principles, of factual details that emerged at the two hearings. Our scope

29

of review is therefore a mixed one, depending upon the particular facet of the trial court's decision in question.

1.

We first consider the consent exception relied upon by the Middlesex County judge. It is well-established that a resident of property may vitiate the warrant requirement by consenting to a search by the police. State v. Domicz, 188 N.J. 285, 305 (2006); see also State v. Legette, 227 N.J. 460, 474-75 (2017) (ruling the State failed to establish consent to justify the warrantless police entry of a residence).

An "essential element" of such consent to conduct a warrantless search is the individual's "knowledge of the right to refuse [it]." State v. Johnson, 68 N.J. 349, 353-54 (1975); see also Legette, 227 N.J. at 475 (reversing a finding of consent by a defendant who had been stopped by an officer on a reasonable suspicion of illegal drug use, because the State had not shown the defendant "thought he could refuse [the officer's] entry into his apartment"). In a noncustodial setting such as the present one, the State does not necessarily have to establish that police officers expressly advised the person who allowed their entry of the right to refuse consent, but that burden remains on the State to demonstrate that person's knowledge of right to refuse. Johnson, 68 N.J. at 354.

"[C]onsent to a warrantless search . . . must be shown to be unequivocal, voluntary, knowing, and intelligent." State v. Sugar, 108 N.J. 151, 156 (1987). Consent is a factual question determined by an examination of the totality of the circumstances. State v. Koedatich, 112 N.J. 225, 264 (1988).

Applying these legal standards, we respectfully disagree with the Middlesex County judge's conclusion that Adl, who opened the front door of the Edison house, gave the large group of assembled police officers valid consent to enter and search the dwelling. The State did not offer any evidence that Detective Triarsi or any of the other officers on the premises advised Adl of his right to refuse consent. Nor did the State establish that Adl already was aware of that right.

The mere fact that Adl leaned aside after he encountered the officers at the door is insufficient proof that he knowingly and voluntarily consented to their entry into the dwelling. As described at the two hearings, Triarsi either "knocked" or "banged" on the door. He was wearing garb that identified him as a law enforcement officer. He was joined by three or more other officers assembled behind him, with several other officers on site. Rather than identify himself or converse with Adl, Triarsi immediately demanded to know "[W]here is he[?]" referring to the suspect.

31

Although there is no proof in the record as to whether any of the officers had their guns drawn, the totality of circumstances objectively would have been intimidating or alarming for a citizen opening the door to this encounter. As the Court observed in Johnson, "[m]any persons, perhaps most, would view the request of a police officer to make a search as having the force of law." 68 N.J. at 354. Hence, "[u]nless it is shown by the State that the person involved knew that he had the right to refuse to accede to such a request, his assenting to the search is not meaningful." Ibid.; see also State v. Rice, 115 N.J. Super. 128, 130-31 (App. Div. 1971) (ruling that where a police officer knocked on an apartment door and entered, without any words being spoken between the officer and the person who opened the door, the entry was not with knowing consent and instead was, "[a]t best . . . permitted in submission to authority").

Given the setting here, the Middlesex County judge's conclusion that Adl voluntarily "invited" the group of officers to enter the house is unrealistic and not supported by substantial credible evidence. We thus conclude the consent exception does not apply.

We likewise are unpersuaded the record suffices to establish Adl had apparent authority to allow the officers into this private dwelling. The United States Supreme Court has applied the apparent authority doctrine "when officers

enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry <u>is a resident of the premises</u> [.]" <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 186 (1990) (emphasis added); <u>see also</u> <u>Georgia v. Randolph</u>, 547 U.S. 103, 109 (2006) (noting that police may reasonably rely upon consent given by "a co-occupant whom the police reasonably, but erroneously, believe to possess <u>shared authority as an occupant</u>" (emphasis added)).

The Court has warned in this context that Fourth Amendment rights must not be "eroded . . . by unrealistic doctrines of 'apparent authority.'" <u>Stoner v.</u> <u>California</u>, 376 U.S. 483, 488 (1964). The Middlesex County trial court's analysis here threatens such an erosion. It is not objectively reasonable for police to assume that whenever an adult answers a door to a dwelling, the adult has the apparent authority to consent to the police entering.

The officers did not ask Adl if he owned or lived in the house. They obtained no information before entering about his reason for being on the premises. Adl's conduct in opening the door in response to Triarsi's knocking or banging, and in thereafter leaning his body away from the officers' path does not provide sufficient objective indicia that he possessed the right to decide who may enter the premises.

33

Indeed, the police appeared to know little about the Edison house other than that it was the present location of Timmons' cell phone. They had no information that defendant or Timmons lived there or whether Adl was their relative or guest. There simply is not enough evidence in this record to conclude, as a matter of law, that Adl possessed the apparent authority to consent to the police entry.

Lastly, we note that it is somewhat instructive that the Union County judge, who was supplied in advance of his own hearing with the suppression transcript containing the Middlesex County judge's earlier oral ruling, did not adopt a consent or apparent authority justification for the search. Instead, as we discuss, infra in Part I(c)(2), the Union County judge rested his suppression ruling on different grounds of exigent circumstances.

## 2.

The doctrine of exigent circumstances is a long-recognized exception to the Fourth Amendment requirement that police obtain a search warrant in order to gain non-consensual entry to a private residence. See Payton v. New York, 445 U.S. 573, 587-88 (1980). "To invoke [this] exception, the State must show that the officers had probable cause and faced an objective exigency." State ex

rel. J.A., 233 N.J. 432, 448 (2018) (citations omitted).  The latter inquiry is fact-sensitive.  Id.

Generally, our courts examine several factors in evaluating whether law enforcement officials have sufficient exigent circumstances to enter a home without a warrant.  These factors typically include:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) reasonable belief that the contraband is about to be removed; (3) the possibility of danger to police officers guarding the site of contraband while a search warrant is sought; (4) information indicating the possessors of the contraband are aware that the police are on their trail; (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in narcotics traffic; (6) the gravity of the offense involved; (7) the possibility that the suspect is armed; (8) the strength or weakness of the facts establishing probable cause[;] and (9) the time of the entry.
>
> [State v. Alvarez, 238 N.J. Super. 560, 568 (App. Div. 1990) (citations omitted).]

These factors are "highly fact-sensitive."  Ibid. (citation omitted).  With respect to the proper weight to assign to these respective considerations, the New Jersey Supreme Court has recognized that "[p]olice safety and the preservation of evidence remain the preeminent determinants of exigency."  State ex rel. J.A., 233 N.J. at 448 (citing State v. Dunlap, 185 N.J. 543, 551 (2006)).

"The determinative factor in many exigency cases is whether the location could have been secured or placed under surveillance for the time period it would have taken to obtain a warrant."  Kevin G. Byrnes, New Jersey Arrest, Search & Seizure, § 11:4-1(e) (2018-2019); see, e.g., State v. De La Paz, 337 N.J. Super. 181, 198 (App. Div. 2001) (ruling that the ability of the police to secure the premises effectively weighed against a finding of exigency).  However, "[t]he ability to maintain security or surveillance is often compromised if the  suspects are aware of police activity, and that in itself can constitute exigent circumstances sufficient to either conduct a full search or to justify the entry onto premises to secure them pending a warrant."  Byrnes, § 11:4-1(e); see, e.g., State v. Galvin, 161 N.J. Super. 524, 530, 542-43 (Law Div. 1978) (finding exigent circumstances justified police entering and securing a second-floor apartment without a warrant, where they had intercepted a phone call asking about cops in the area).  Here, the record contains no evidence that the persons inside of the Edison house were aware of the presence of the police and the surveillance of the dwelling.

Objectively assessed, the pertinent factors weigh against a conclusion of exigency in this case.  To be sure, the recent homicide was a grave and violent offense.  The person who shot the victim could reasonably be expected to be

dangerous and armed, since the gun used in the shooting had not been recovered. There was probable cause that a serious crime had been committed, and the police had reason to suspect that defendant, who had been seen arguing earlier with the victim, was the culpable shooter.

On the other hand, the urgent necessity of police to burst into the house without first attempting to obtain a telephonic warrant is not fairly supported by the record. The State admits that the police were not in "hot pursuit" of defendant. See State ex rel. J.A., 233 N.J. at 449 (defining hot pursuit as the "immediate or continuous pursuit of the [suspect] from the scene of [a] crime." (citations omitted)). In fact, the police were not confident that defendant was actually inside of the house. There is no evidence that defendant or Timmons had been seen going into the dwelling. It was uncertain whether any contraband or evidence of the "drive-by" shooting that occurred ten days earlier was in the house. Numerous law enforcement officers were assembled at the location, monitoring whether someone would leave or enter the house, all poised to take action.

Perhaps the most significant fact that deflates the State's claim of exigency is the revelation at the Union County suppression hearing that Detective Triarsi and several of the officers had the time to meet at a local diner to discuss and

plan their entry into the house. While that meeting was occurring, other officers were back surveilling the house and securing the location. The length of the diner meeting is not disclosed in the record, and we do not know if the officers stayed long enough to have a meal or a beverage there. Regardless of the actual duration, the State has failed to show why the time spent at the diner could not have been used by one of the officers to contact an emergent duty judge and seek a telephonic warrant. Notably, the Union County judge's written opinion does not address the diner meeting, or its bearing upon the State's claim of urgency. In addition, we note the police were able to obtain two CDW warrants a few hours earlier without any apparent difficulty.

In State v. Penalber, 386 N.J. Super. 1, 13 (App. Div. 2006), this court recognized a distinction between "planned" arrests and unplanned arrests made in the course of an ongoing investigation. In Penalber, we faulted law enforcement authorities for not arresting the defendant immediately after the officer had purchased drugs from the defendant. Id. at 14. Instead, the officer "walked back to the police station, met with the officers on his backup team, which resulted in a decision to arrest [the defendant], and then returned to the apartment house to make the arrest." Ibid. We noted that "[a] period of thirty to forty-five minutes elapsed between the undercover purchase of cocaine and

the officers' return to the apartment house, which would have provided ample time to obtain a telephone warrant for [the defendant]'s arrest." Ibid. Thus, we concluded the exigent circumstances exception to the warrant requirement did not apply. Id. at 15. We noted in Penalber that:

> In determining whether a warrantless entry into a residence was justified by genuine exigent circumstances or was instead the product of a police-created exigency, a court should "appraise the [officers'] conduct during the entire period after they had a right to obtain a warrant and not merely from the moment when they knocked at the [suspect's] front door."
>
> Id. at 13 (citations omitted).

As we have noted, the Union County judge analogized this case to the scenario presented in State v. Craft, 425 N.J. Super. 546 (App. Div. 2012). Craft is distinguishable from the present case. In Craft "the primary issue on appeal [was] whether the police violated [the] defendant's constitutional rights when they entered the bedroom in his mother's apartment without a search warrant," once the defendant's mother had already consented to the officers' entry into her apartment. Id. at 552, 555. There, unlike the present case, law enforcement personnel knew the defendant's family resided at the address, the defendant's mother consented to the officers' entry, and officers had reason to believe the defendant was in the next room when a cell phone started to ring just after the

defendant's mother began to call her son's phone. Id. at 554-55. We noted the arrest warrant arose from a shooting and therefore the defendant was viewed as potentially dangerous. Id. at 555.

Given the situation in Craft, we were satisfied "there was a compelling need for immediate action to apprehend [the] defendant, and it was impracticable for the officers to obtain a search warrant." Ibid. For the reasons we have already set forth, including the time police spent planning at the diner meeting, the large number of officers surveilling the house, and the apparent ease in obtaining the CDWs, no comparable urgency or impracticability in seeking a proper search warrant is shown by this record. The Union County judge therefore erred in upholding the search and seizure based upon a premise of exigent circumstances.[6]

## D.

Having concluded that neither the consent nor exigency exceptions to the warrant requirement are supported by the record or the applicable law, we must consider the ramifications of that conclusion.

---

[6] We add that the Middlesex County judge, by comparison, did not rely on the doctrine of exigent circumstances, although the transcript of that suppression hearing contains no such argument by the State.

 A-3707-15T3

With respect to the Middlesex County prosecution, it is clear that the firearm and drugs police seized from the house after their illegal warrantless entry were "fruits of the poisonous tree" and should have been suppressed. Consequently, the Middlesex County case must be remanded to afford defendant an opportunity to withdraw his guilty plea.

The outcome differs in the Union County case. It is not readily apparent that the jacket Detective Triarsi retrieved from the house at defendant's request was the fruit of an illegal search. To be sure, the police should not have been inside of the house in the first place without a search warrant. But once defendant had been arrested and brought outside, he initiated and requested the re-entry of Triarsi in order to get his jacket. It is unclear whether defendant had or lacked the authority to permit anyone into the residence. Even assuming he did not have such authority, there is a substantial question, which we need not resolve here, as to whether the jacket retrieval was sufficiently attenuated from the original illegal intrusion to require its suppression. See, e.g., State ex rel. J.A., 233 N.J. at 446-48 (delineating the contours of attenuation principles). As the Union County judge noted, "This was nothing more than the police complying with a reasonable request of a defendant in custody. The fact that the police later realized that the jacket had some evidentiary value does not turn

this into a search and seizure." The judge's observations, although not couched with the term "attenuation," provide considerable support for such a legal conclusion, although we need not decide that point here.

In any event, we are satisfied that any possible error in the admission of the jacket evidence at the Union County trial was harmless, in light of the independent proofs of defendant's guilt. State v. Macon, 57 N.J. 325, 333 (1971). The jacket was, at best, a minor ingredient of the prosecution's case. The heart of the dispute at trial was whether the victim had been shot from the Toyota or from his brother in the front seat of the Acura. The jacket did not prove which person was the shooter. At most, it simply helped confirm that defendant had been driving the Toyota, a fact that was separately established by other proof, including Scott, the Toyota passenger.

We likewise discern no basis to grant defendant a new trial in the homicide case because of the admission of his post-arrest statement to the sergeant. As we have noted, the statement was blurted out by defendant without any prompting from the officer. It was not a fruit of the illegal entry into the house. The police already had a valid warrant to arrest defendant. If the police had arrested defendant at another time and location, he conceivably might have tried

A-3707-15T3

to initiate a similar conversation with an arresting officer. In sum, the nexus between the statement and the illegality of the house entry is highly attenuated.

Moreover, the content of the statement, and its unspecified reference to "the girl," is not clearly incriminatory. It was hardly a key ingredient of the State's case, which was supported by considerable independent evidence. Although we are mindful the jury in the first trial was hung and the jurors in the second trial initially reported they were deadlocked, we do not regard the post-arrest statement as "clearly capable" of producing any unjust result in the Union County case. R. 2:10-2.

## II.

We next consider defendant's arguments concerning testimony the State elicited at the second Union County trial from Detective Adrian Gardner concerning the direction of what is known as a "trajectory rod" she placed into the bullet hole in the Acura's back seat cushion.

The short portion of Gardner's testimony at the second trial that is the focus of defendant's claim of reversible error is as follows:

> Q     [by Union County assistant prosecutor] Detective, if you had continued that trajectory rod several more feet, where would the trajectory rod have led to?

> A     The trajectory rod was leading towards the rear
> passenger door at an upward angle towards the window.

Defendant argues it was improper for the court to have permitted Gardner to say this without her being qualified as an expert witness under N.J.R.E. 702. He also maintains the testimony was unfairly prejudicial and the court was obligated to exclude it under N.J.R.E. 403. We disagree.

Gardner testified as a lay witness. Under N.J.R.E. 701, lay witnesses may testify about relevant matters based on their personal knowledge. Lay witnesses may also present certain opinion testimony, provided those opinions are "rationally based on the perception of the witness" and "will assist in understanding the witness' testimony or in determining a fact in issue." N.J.R.E. 701; see also State v. McLean, 205 N.J. 438, 463 (2011) (explaining these concepts and noting the limitations of allowing police witnesses to present what are essentially expert opinions in the guise of lay opinion).

The State rightly notes that, at no point during the quoted exchange concerning the trajectory rod does Gardner or the prosecutor refer to the bullet that hit Stroud and passed through his body, including its trajectory or whether the bullet's origin could be determined from the trajectory rod's orientation. Gardner's testimony with respect to the rod, and identifying the direction in

which it pointed, was based on her own factual observations of touch and sight. Her brief testimony on the subject was not an expert opinion.

Even if we were to deem Gardner's testimony to be in the nature of an opinion, its admission into evidence did not violate the lay opinion rule. The testimony was grounded on her personal knowledge. It was potentially helpful to the jury as an aid to determine the source and direction of the fatal shot and the identity of the shooter. We discern no violation of N.J.R.E. 701 nor the limitations espoused in McLean.

Nor do we conclude the trial judge abused his discretion in admitting this testimony. Evidential rulings typically "should be upheld 'absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment.'" State v. J.A.C., 210 N.J. 281, 295 (2012) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). We detect no such clear error here. Although the ultimate probative value of the trajectory rod evidence may be reasonably debated (since the bullet passed through the victim's body and logically could have altered course before striking the seat cushion), we are unpersuaded that the probative value was "substantially outweighed" by defendant's contention of undue prejudice. See N.J.R.E. 403. We therefore reject defendant's claim for a new trial on this asserted basis.

A-3707-15T3

III.

Little needs to be said about defendant's final argument that the Union County judge was obligated, sua sponte, to supply the jury with the model instruction about third-party guilt.  See Model Jury Charges (Criminal), "Third Party Guilt Jury Charge" (approved Mar. 9, 2015).  This instruction essentially reinforces the more general instruction to the jurors, which was repeatedly delivered by the judge, underscoring that the State always maintains the burden of proof in a criminal trial and the defense has no obligation to prove anything or present any evidence.  The third-party guilt instruction simply ties those general precepts to a context where, as here, a defendant is suggesting that some other person is responsible for the harm he is alleged to have caused.

Viewing, as we must, the charge as a whole in light of the record, we are unpersuaded the court's omission of the unrequested third-party guilt charge was likely to cause an unjust outcome in this case.  "Plain error in the context of a jury charge . . . [must be] sufficiently grievous . . . to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."  State v. Hyman, 451 N.J. Super. 429, 455 (2017) (quoting State v. Torres, 183 N.J. 554, 564 (2005)).  "Under the plain error standard, 'defendant has the burden of proving that the error was clear and obvious and that it affected his substantial

46

rights.'" State v. Koskovich, 168 N.J. 448, 529 (2001) (citing State v. Morton, 155 N.J. 383, 421 (1998)).

That burden is not met here. The prosecutor did not suggest in summations or otherwise that the defense had a burden to prove that Roberts, rather than defendant, shot the victim, or that defendant was not allowed to rely on evidence from the State's case in chief to support such an alternative theory. The third-party guilt charge was not needed here to defuse some misimpression injected into the case. Nor is the situation even remotely akin to the omission of a lesser-included offense instruction that is "clearly indicated" by the proofs. Cf. State v. Jenkins, 178 N.J. 347, 361 (2004).

IV.

For these reasons, we affirm defendant's conviction in the Union County case (A-3707-15) and reverse and remand in the Middlesex County case (A-0060-16) to afford defendant an opportunity to withdraw his guilty plea and have that judgment of conviction vacated.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION